UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN O. SCHARNWEBER, | ) | CIV. 09-4025-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER REMANDING TO |
| vs. | ) | STATE COURT BECAUSE OF |
| | ) | LACK OF JURISDICTION |
| DAKOTA, MINNESOTA & EASTERN | ) | |
| RAILROAD CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Steven Scharnweber, moves for partial summary judgment
with regard to several claims alleged in the complaint. Defendant, Dakota,
Minnesota & Eastern Railroad Corp., (DM&E), opposes Scharnweber's
motion for summary judgment and moves to amend its answer to include an
affirmative defense. Because subject matter jurisdiction does not exist, the
case is remanded to state court.

**BACKGROUND**

On May 26, 2007, Scharnweber signed an employment security
agreement with DM&E because of an upcoming change in control over the
business. Under the employment security agreement with DM&E,
Scharnweber was entitled to various benefits in the event that he was
terminated without good cause within two years after a change in control
over the business. In exchange, Scharnweber was required to execute a
release that was reasonably satisfactory to DM&E.

On December 18, 2008, DM&E fired Scharnweber without good cause. DM&E offered Scharnweber $584,823.44 in return for executing a release proposed by DM&E. Scharnweber refused to sign the release because he believed that it was too broad and that the compensation was not in accordance with the terms of the employment security agreement. DM&E revised the release document and offered $639,823.44 to Scharnweber. Scharnweber rejected the revised offer because he still believed that the offer was not in accordance with the employment security agreement. Scharnweber instead signed his own version of a release and offered it to DM&E for purposes of satisfying his obligations under the employment security agreement. DM&E rejected Scharnweber's proposed release.

On March 4, 2009, Scharnweber brought suit against DM&E in state court asserting various claims under state contract law and state wage laws. On March 5, 2009, DM&E removed the case to federal court on the theory that federal jurisdiction existed because Scharnweber would be exposed to a federal tax penalty.[1] On March 13, 2009, DM&E paid Scharnweber $584,823.44 to avoid looming federal taxation penalties if Scharnweber was paid at a later date. After the deadline to amend the pleadings and to complete discovery passed, Scharnweber moved for partial summary

---

[1] Scharnweber does not object to being in federal court.

judgment. In response, DM&E asserted the affirmative defense of ERISA preemption and moved to amend its answer to add the affirmative defense of ERISA preemption.

## DISCUSSION

Removal to federal court is proper "only if the claims could have been originally filed in federal court." *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009) (citations omitted). "[T]he party seeking removal has the burden to establish federal subject matter jurisdiction." *Id.* at 912 (citation omitted). "All doubts about federal jurisdiction should be resolved in favor of remand to state court." *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010) (citation omitted).

This case is not before the court on the basis of diversity. Instead, federal jurisdiction is premised on two variations of what is generally known as "arising under" jurisdiction: (1) federal jurisdiction exists because the state-law claims "implicate significant federal issues," *Cent. Iowa Power Coop.*, 561 F.3d at 912 (quoting *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005)); or (2) federal jurisdiction exists because the claims arise "under the civil enforcement provision of . . . ERISA . . . including a claim to recover benefits or enforce rights under the terms of an ERISA plan." *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr.,*

*Inc.*, 413 F.3d 897, 907 (8th Cir. 2005) (internal quotations and citation

omitted).

## I.      Federal Jurisdiction Based on a Significant Federal Issue

The Supreme Court explained in *Grable & Sons Metal Products., Inc. v.

*Darue Engineering & Manufacturing*, 545 U.S. 308 (2005), that "in certain

cases federal-question jurisdiction will lie over state-law claims that

implicate significant federal issues." *Id.* at 312 (citations omitted). "To

determine whether a case fits 'within th[is] special and small category,' . . .

'the question is, does a state-law claim necessarily raise a stated federal

issue, actually disputed and substantial, which a federal forum may

entertain without disturbing any congressionally approved balance of

federal and state judicial responsibilities.' " *Cent. Iowa Power Coop.*, 561

F.3d at 912 (citations omitted). Stated differently, "[i]f [Scharnweber's] right

to relief necessarily depends on the resolution of a disputed and substantial

question of federal law," then the case was properly removed to federal

court. *See id.*

Here, the parties assert that the "question of federal law" stems from

the possibility that Scharnweber would have to pay a tax penalty under

section 409A of the Internal Revenue Code if DM&E did not pay him before

a certain date.[2] The parties claim that a "significant federal issue" was

---

[2] While the complaint does not identify the basis for the potential tax
penalty, later filings reveal that the source for the potential tax penalty was

4

implicated because the potential $100,000 tax penalty satisfied the "irreparable harm" element that is needed for injunctive relief.

There appears to be no dispute that Scharnweber would have been subjected to a penalty under section 409A in the event that he did not receive the payments before March 15, 2009. In fact, DM&E admits that it informed Scharnweber of the possibility that he would be subjected to a tax penalty. Docket 37 at 6-7. This lack of an actual dispute as to whether Scharnweber would be subjected to a tax penalty demonstrates that the "variety of federal 'arising under' jurisdiction" discussed in *Grable* is not present. *Grable & Sons Metal Prods., Inc.*, 545 U.S. at 314 ("[T]he question is, does a state-law claim necessarily raise a state federal issue, *actually disputed* and substantial[.]" (emphasis added)).

Furthermore, the complaint mentions the possibility of a tax penalty twice. The first instance is under the section entitled "FACTS COMMON TO ALL COUNTS," and reads as follows: "If DM&E fails to pay the sum of $500,000.00, one of the payments due under Exhibit A, before March 15, 2009, Plaintiff may be subject to a tax penalty of $100,000.00. DM&E has used this deadline oppressively as a means to coerce Plaintiff into executing Exhibit A."[3] Docket 1, Ex. A. at 6-7. The second instance is found in

section 409A of the Internal Revenue Code.

[3] While the last sentence identifies Exhibit A, it appears Scharnweber intended to cite Exhibit C because other portions of the complaint identify Exhibit C as the Separation Agreement and Release. None of the exhibits

Count 1, a breach of contract claim, and reads as follows: "As a proximate result of such breaches, Plaintiff has and will incur damage and detriment in the amounts of the Severance Benefits and, if applicable, the tax penalty assessable against Plaintiff in the amount of $100,000.00." Docket 1, Ex. A at 7. These two brief references to a potential federal tax penalty do not support the position that the issue was substantial. Rather, after considering the state court complaint, and considering the legal theories relied on by Scharnweber, the references in the complaint to the tax penalty are more properly construed as background information. *See Cent. Iowa Power Coop.*, 561 F.3d at 915.

Scharnweber is attempting to enforce the employment security agreement as he views it. And whether the employment security agreement is to be enforced according to his views does not depend on section 409A of the Internal Revenue Code. A state court's handling of Scharnweber's claims that entails references to the fact that Scharnweber might be subjected to a federal tax penalty would not disturb the "congressionally approved balance of federal and state judicial responsibilities." *See id.* at 914 (internal quotations and citation omitted) ("[I]nsofar as the state court may have occasion to consider the [federal issue] in adjudicating [the plaintiff's] state law claims, we do not think that the state court's consideration of the

identified in the complaint were filed with DM&E's notice of removal.

[federal issue] disturbs the 'congressionally approved balance of federal and state judicial responsibilities[.]' "). Thus, the court finds that the complaint's references to a potential federal tax penalty do not raise a sufficient federal issue for purposes of establishing federal jurisdiction. *See Cent. Iowa Power Coop.*, 561 F.3d at 915. Because the court does not have jurisdiction over this dispute based on a potential federal tax penalty, the court must determine whether federal jurisdiction lies based on ERISA.

## II.  Federal Jurisdiction Based on ERISA

In response to Scharnweber's motion for partial summary judgment, DM&E argues that Scharnweber's claims are preempted by the Employee Retirement Security Act of 1974 (ERISA).[4] Scharnweber argues that DM&E waived this argument by failing to raise it in a timely manner.

---

[4] If the employment security agreement is an ERISA plan, then the claims that are effectively attempting to recover benefits or enforce the rights granted pursuant to the plan are completely preempted and construed as arising under 29 U.S.C. § 1132(a). *See Prudential Ins. Co. of Am.*, 413 F.3d at 907. "[A]ny claim filed by a plan participant for the same relief provided under ERISA's civil enforcement provision[, 29 U.S.C. § 1132(a),] even a claim purportedly raising only a state-law cause of action, arises under federal law and is removable to federal court." *Id.* The claims that purport to arise under specific South Dakota statutes relating to wages, however, may be subject to ERISA's "express preemption" clause found in 29 U.S.C. § 1144(a), which preempts "any state law that 'relate[s] to any employee benefit plan.' " *Id.* (alteration in original). The "express preemption" clause "does not allow for automatic removal to federal court[.]" *Id.* Rather, it "provide[s] an affirmative defense against claims not completely preempted under [29 U.S.C. § 1132(a)]." *Id.*

At the outset, it must be understood that there is a difference between what is known as "ordinary preemption" and "complete preemption." *Firstcom, Inc. v. Quest Corp.*, 555 F.3d 669, 677 n.6 (8th Cir. 2009). " '[O]rdinary preemption' provid[es] a substantive defense to a state law action on the basis of federal law." *Id.* at 677 (alteration in original) (quoting *Stuart Weitzman, LLC v. Microcomputer Res., Inc.,* 542 F.3d 859, 864 n.4 (11th Cir. 2008)). Whereas complete preemption "is a jurisdictional doctrine . . . that applies where the federal preemptive power is complete." *Id.* at 677 n.6 (internal quotations and citation omitted).

In the complete preemption context, the issue cannot be waived because it is a subject matter jurisdiction issue " 'that affects the choice of forum rather than the choice of law[.]' " *Johnson v. Armored Transp. of Cal. Inc.*, 813 F.2d 1041, 1043 (9th Cir. 1987) (citation omitted). The affirmative defense of ordinary preemption, however, can be waived[5] because the issue concerns "only choice of law," not "choice of forum." *Ace Elec. Contractors, Inc. v. Int'l Bhd. of Elec. Workers, Local Union No. 292*, 414 F.3d 896, 903 (8th Cir. 2005) (recognizing that "preemption questions concerning choice of forum are jurisdictional but preemption questions concerning only choice of law are waived if not timely raised" (citing *Johnson*, 813 F.2d at 1043-44)). To summarize, the complete preemption doctrine cannot be waived; an

_____

[5] Because there is no federal jurisdiction, the court does not address whether DM&E waived any affirmative defenses.

affirmative defense can be waived. Because the complete preemption

doctrine cannot be waived, the court must next determine whether

Scharnweber's employment security agreement with DM&E is an ERISA

plan in the context of complete preemption.[6]

DM&E argues that the structure and terms of the employment

security agreement demonstrate that it is an ERISA plan that is commonly

referred to as a "top hat" plan.[7] Scharnweber argues that the employment

security agreement is not an ERISA plan because there is no ongoing

administrative scheme that requires DM&E to exercise its discretion. "The

existence of an ERISA plan is a mixed question of fact and law[.]" *Kulinski v.*

*Medtronic Bio-Medicus, Inc.*, 21 F.3d 254, 256 (8th Cir. 1994) (citations

omitted).

Under ERISA, a " 'plan' means an employee welfare benefit plan or an

employee pension benefit plan or a plan which is both an employee welfare

benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3). It

---

[6] Both parties have briefed the issue of whether the employment security agreement is actually an ERISA plan. Docket 40 at 6-11; Docket 44 at 9-18. Therefore, the issue of whether federal jurisdiction exists under ERISA has been adequately briefed.

[7] "A so-called 'top hat' plan . . . provides 'deferred compensation for a select group of management or highly compensated employees[.]' " *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 932 n.6 (8th Cir. 1999) (citation omitted). Regardless of whether the employment security agreement is identified as a "top hat" plan or not, "a 'top hat' plan must be an ERISA 'plan' in the first instance." *Id.* at 932 n.6 (citation omitted).

is clear from the employment security agreement that the provisions and terms therein would only apply if Scharnweber was terminated without cause or resigned with cause. Thus, if the employment security agreement is an ERISA plan, it would be considered a welfare benefit plan. *See Massachusetts v. Morash*, 490 U.S. 107, 116 (1989) ("[P]lans to pay employees severance benefits, which are payable *only* upon termination of employment, are employee welfare benefit plans within the meaning of [ERISA]." (citations omitted); *Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 947 (6th Cir. 1990) ("It is now well established that severance benefit plans . . . are welfare benefit plans." (citations omitted)). And an employee welfare benefit plan is defined as "any plan, fund, or program which was . . . established or maintained by an employer" that provides "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment or vacation benefits," and other benefits. *See generally* 29 U.S.C. § 1002(1). As recognized by the First Circuit Court of Appeals, "[t]he text of ERISA itself affords scant guidance as to what constitutes a covered 'plan' " because it "merely constructs a tautology, defining an employee benefit plan as 'any plan, program or fund' established or maintained by an employer that provides certain benefits to employees." *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 454 (1st Cir. 1995).

Nonetheless, there is guidance for determining whether the employment security agreement at issue constitutes an ERISA plan. "[T]he

standard to be applied to determine whether a benefits plan falls within

ERISA's ambit . . . is whether the plan requires the establishment of a

separate, *ongoing administrative scheme* to administer the plan's benefits."

*Kulinski*, 21 F.3d at 256-57 (emphasis added) (internal citations omitted).

"An employer's decision to extend benefits does not constitute, in and of

itself, the establishment of an ERISA plan." *Id.* at 256 (citations omitted).

DM&E argues that the employment security agreement derives from

or relates to a previously existing ERISA plan. In support of this argument,

DM&E relies on section 2(4) of the employment security agreement, which

indirectly references an apparent ERISA plan. Docket 29, Ex. 1 at 5-6.

Section 2(4) provides that Scharnweber, his spouse, and dependents would

continue to be covered by all existing welfare plans in the event that

Scharnweber was terminated without good cause within two years after a

change in control. Docket 29, Ex. 1 at 5-6. Contrary to DM&E's assertion

otherwise, the reference to an existing ERISA plan does not mean the

employment security agreement derives from, modifies, or otherwise relates

to an ERISA plan.

Nothing in the record suggests that the employment security

agreement was entered into for purposes of modifying an existing ERISA

plan. The employment security agreement itself states that "Executive and

Employer desire to enter into the Agreement in order to provide security to

Executive with respect to his employment." Docket 29, Ex. 1 at 2. Indeed,

DM&E's own recount of the factual background shows that the employment security agreement was made for the sole purpose of securing Scharnweber's position if there was a change in control of the business. Docket 37 at 2. Thus, the background facts and the document itself demonstrate that the parties did not intend to modify any existing ERISA plan by entering into the employment security agreement. Rather, they intended to secure Scharnweber's position in the event of a change in control over the business. *See Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 505 (8th Cir. 2001) (rejecting the trial court's conclusion that there was jurisdiction under ERISA because "the promised benefits were derived from an employee benefit plan" when there was no indication "that the [] promises constituted a change in the company's plan as opposed to a distinct, one-time offer of benefits").

Moreover, section (13) in the employment security agreement, entitled "Entire Agreement," states that "[t]he Agreement contains the entire Agreement between Employer and Executive and supersedes any and all previous agreements, written or oral, between the parties relating to the subject matter hereof." Docket 29, Ex. 1 at 9. " 'It is a fundamental rule of contract construction that the entire contract and each and all of its parts and provisions must be given meaning if that can consistently and reasonably be done.' " *Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1037 (8th Cir. 1978) (quoting *Ponderosa-Nevada, Inc. v. Venners*, 243 N.W.2d 801,

12

804 (S.D. 1976)). If the employment security agreement were construed as

relating to or modifying the preexisting ERISA plan that provides

Scharnweber and his family with welfare plan benefits, then the references

to the preexisting ERISA plan in section 2(4) would be rendered meaningless

because the preexisting ERISA plan would be superseded by the

employment security agreement. To give meaning to both sections (13) and

2(4), the employment security agreement must be read as a separate,

independent contract that provided Scharnweber with benefits relating to a

different subject matter than those afforded him under the preexisting

ERISA plan, if he was terminated without cause within two years after a

change in control over the business. The employment security agreement

did not eliminate or otherwise modify the preexisting ERISA plan. Thus, if

the employment security agreement is to be construed as an ERISA plan, it

must be because the employment security agreement itself is an ERISA

plan.[8]

The Eighth Circuit Court of Appeals identified four factors to consider

when determining whether "promised benefits themselves" constitute an

ERISA plan. *Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 506 (8th Cir.

2001). The four factors are (1) "whether the payments are one-time lump

---

[8] Scharnweber would not be entitled to the benefits at issue had there
been no employment security agreement. Thus, if jurisdiction exists under
ERISA, it exists because the employment security agreement is an ERISA plan.

sum payments or continuous payments," (2) "whether the employer undertook any long-term obligation with respect to the payments," (3) "whether the severance payments come due upon the occurrence of a single, unique event or any time that the employer terminates employees," and (4) "whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees." *Id.*

Under the first factor, whether the payments are a one-time lump sum payment or continuous payments, the employment security agreement includes numerous provisions that provide for lump sum payments. For example, subsection 2(1) reads as follows: "Employer shall pay Executive or his Beneficiary $500,000. Such amount shall be paid to Executive or his Beneficiary in a lump sum within 30 days after his date of termination of employment." Docket 29, Ex. 1 at 5. Section 2(2) also indicates that Scharnweber is entitled to a lump sum payment as to "any and all benefits accrued under" "any Incentive Plan, Retirement Plan, Welfare Plan[.]" Docket 29, Ex. 1 at 5. And section 2(3) explains that with regard to stock options, payments "will be paid in cash to Executive or his Beneficiary in a lump sum within 30 days after his date of termination of employment." Docket 29, Ex. 1 at 5.

There is one provision in the employment security agreement, however, that calls for continuous payments. In section 2(4), the employment security agreement states that if Scharnweber's employment

14

ends under certain circumstances, "Employer will continue to pay the costs of [insurance] coverage of Executive and his spouse, and other dependents[.]" Docket 29, Ex. 1 at 5. The provision further states that if coverage is not possible under the terms of the insurance plans, "Employer will provide substantially identical benefits." Docket 29, Ex. 1 at 5-6. Finally, the provision explains that coverage "will cease if and when Executive obtains employment with another employer during the Severance Period, and becomes eligible for coverage under any substantially similar Welfare Plan provided by his new employer." Docket 29, Ex. 1 at 6.

The employment security agreement therefore requires both one-time lump sum payments and continued payments. The provision requiring continued insurance coverage after Sharnweber's termination, however, could last no longer than two years. This is because section 2(4) begins with "During the Severance Period," and section 1(g) defines the term "severance period" as meaning "the period beginning on the date Executive's employment with Employer terminates . . . and ending on the date 24 months thereafter." Docket 29, Ex. 1 at 4, 5. Thus, while the employment security agreement contains one continuous payment provision, the period for such continuous payments is limited. After reviewing the employment security agreement as a whole, the court finds that the first factor weighs slightly in favor of finding that the employment security agreement is not an ERISA plan.

With regard to the second factor, whether the employer undertook any long-term obligation with respect to the payments, the employment security agreement requires DM&E to pay Scharnweber the lump-sum payments within 30 days of the end of his employment or at "the earliest practicable date permitted." Docket 29, Ex. 1 at 5. The benefits identified in the employment security agreement were unfunded.[9] Docket 29, Ex. 1 at 7. And nothing in the record indicates that DM&E set aside funds to ensure the availability of the benefits identified in the employment security agreement. Furthermore, as discussed above, the employment security agreement provided for payments to Scharnweber for, at most, two years. These facts demonstrate that the employment security agreement did not require DM&E to undertake any long-term obligations. *See Antolik v. Saks Inc*, 278 F. Supp. 2d 997, 1003 (S.D. Iowa 2003) (finding that the employer "undertook no long term obligations with respect to the payments" because "the window of eligibility [was] only open for two years following a change of control"). Thus, the second factor weighs in favor of finding that the employment security agreement is not an ERISA plan.

_____

[9] The section stating that the benefits were to be unfunded begins with the phrase "Except as otherwise provided in section 15[.]" Docket 29, Ex. 1 at 7. Section 15, however, only states that, "The Agreement may be executed in counterparts, each of which shall be deemed an original." Docket 29, Ex. 1 at 7. After reviewing the employment security agreement, the court was unable to identify any exceptions to the provision that called for the benefits to be unfunded.

With regard to the third factor, whether the severance payments come due upon the occurrence of a single, unique event or any time that the employer terminates employees, section 2(a) explains that the benefits created in the employment security agreement would become available only in the event that there was "a Change in Control," as defined in the employment security agreement. Docket 29, Ex. 1 at 4. Only then would the listed benefits become available to Scharnweber if he was subsequently fired without cause or quit with cause within two years of the change in control. Docket 29, Ex. 1 at 5. Nothing in the record indicates that Scharnweber would have been entitled to the benefits listed in the employment security agreement if he had been fired when there had been no change in control.

Accordingly, the facts in this case are materially distinguishable from the facts in *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929 (8th Cir. 1999), where the Eighth Circuit found that there was an ERISA plan because "[t]erminations that qualify employees for severance benefits could take place *at any time*, and such terminations are likely to *recur for as long as [the employer] has employees*." *Id.* at 935 (emphasis added). *See also Crews*, 274 F.3d at 506 (finding *Emmenegger* to be "inapposite because in that case . . . payments became due under it whenever an employee was fired"). Here, the severance payments could only become due if there was a single, unique event—a change in control of the business. *Cf. Crews*, 274 F.3d at 506 (finding that there was no ERISA plan partly because the

alleged promise "was made in response to a single, unique event, namely, the termination of [the employer's] contract with the Health Care Finance Administration"). Thus, the third factor weighs in favor of finding that the employment security agreement does not constitute an ERISA plan.

With regard to the fourth factor, whether the severance arrangement under review requires the employer to engage in a case-by-case review of employees, there is evidence that DM&E entered into separate employment security agreements with other high level employees. Docket 24 at 2. Apparently four other substantially similar employment security agreements were created.[10] DM&E argues that it must engage in a case-by-case review of the five employees and exercise its discretion in determining whether an employee was terminated without cause or resigned with cause. In support of this argument, DM&E relies on *Emmenegger* where the Eighth Circuit Court of Appeals noted that a severance plan constituted an ERISA plan partly because the "benefits [were] to be paid only to those employees who [were] not terminated for disciplinary reasons and who also have given excellent service to [the employer], and then judgments must be made." *Emmenegger*, 197 F.3d at 935.

---

[10] These other agreements have not been provided to the court. Scharnweber has not refuted DM&E's claims in this regard. The court assumes that DM&E's claims about the four other agreements are true.

*Emmenegger* is distinguishable from the facts in this case because there the severance plan at issue potentially applied to every employee. *See id.* at 934, 935 (stating that it was the "Company's policy to provide severance pay to *employees* who are terminated for reasons other than disciplinary and who have given the Company excellent service during their employment" and that the "decision to pay benefits [was] made on an individual, *ongoing basis*" (emphasis added)). In contrast with *Emmenegger*, the employment security agreements in this case only applied to five people for a predetermined period of time. Because the number of employees is not controlling as to whether the employment security agreement is an ERISA plan, however, DM&E was potentially required to engage in a limited case-by-case review of its employees.[11]

To summarize, the first factor weighs slightly in favor of finding that the employment security agreement is not an ERISA plan. The second and third factors weigh in favor of finding that the employment security agreement does not constitute an ERISA plan. The fourth factor weighs slightly in favor of finding that there is an ERISA plan if the employment security agreements are viewed collectively.

---

[11] The court assumes that it is proper to consider the employment security agreements collectively. If the employment security agreement at issue was viewed in isolation, there would be no case-by-case review. In that situation, the fourth factor would also support a finding that the employment security agreement is not an ERISA plan.

After weighing these factors, the court finds that there is no ongoing administrative scheme necessary to fulfill the obligations of the employment security agreement. The employment security agreement is not an ERISA plan. Rather, the employment security agreement "constitute[s] a free-standing contract providing severance payments upon the occurrence of some future contingency." *See Eide v. Grey Fox Technical Servs. Corp.*, 329 F.3d 600, 607 (8th Cir. 2003); *see also Crews*, 274 F.3d at 506-07 (finding that the "promised benefits were neither premised on nor constituted an employee benefit plan"). Any doubt about whether the employment security agreement is an ERISA plan is put to rest by the rule that "[a]ll doubts about federal jurisdiction should be resolved in favor of remand to state court." *In re Prempro Prods. Liab. Litig.*, 591 F.3d at 620.

## CONCLUSION

The court finds that federal jurisdiction does not exist in this case because: (1) the state-law claims do not involve a significant federal issue that is actually disputed; and (2) the employment security agreement does not derive from, modify, relate to, or constitute an ERISA plan. Because there is no federal jurisdiction, the court cannot address Scharnweber's motion for summary judgment or DM&E's motion to amend its answer to assert the affirmative defense of ERISA preemption. "When a federal court to which a case has been removed from a state court determines that it lacks jurisdiction, the proper action is not dismissal of the complaint, but remand

20

to the state court." *Cont'l Cablevision of St. Paul, Inc. v. U.S. Postal Serv.*, 945

F.2d 1434, 1441 n.3 (8th Cir. 1991) (noting that "[s]ection 1447(c) of Title 28

expressly so provides").

Therefore, it is

ORDERED that this case is remanded to state court.

Dated September 20, 2010.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE